*IN ERROR.*
.......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

————— ❧ —————

ABRAHAM VAN GORDEN, } *Plaintiff in Error,*

*against*

JAMES JACKSON, *ex dem.* JAMES } *Defendant in Error.*
BOGARDUS and others,

According to the true construction of the *Catskill* patent, its boundaries are to be ascertained by lines four miles distant, in every direction, from the *five plains* mentioned in the patent, so as to make the exterior lines of the patent, correspond as far as possible with the sinuosities of the plains, and so that a line four miles long, extended from any part of the exterior sides of the *plains*, will touch some part of the exterior boundary of the patent.

AN action of *ejectment* was brought in the supreme court, by the defendant in error, to recover the possession of a lot of land in the town of *Catskill*, in the county of *Greene*, being lot No. 12, in the second division of a tract called *Lindsay's* patent.

The defendant in error, claimed title in three ways :

1. By an uninterrupted possession of 60 years.

2. By a possessory right, derived from a peaceable possession of twenty years.

3. By letters patent from the king of *Great Britain*, and seisin under that title.

The defendant in error gave in evidence ; 1. an *In-*
*dian* deed, dated 26th *June*, 1684, witnessed by *Marte*
*Garretse* and *Cornelius Van Dyke*, by which, the then
*Indian* proprietors conveyed to *Guysbert Outen Bogart*, a
tract of land which included the premises in question.

2. An *Indian* deed to Capt. *Francis Salisbury* and
*Marte Garretse*, dated 8th *July*, 1678.

3. An *Indian* deed to the same parties, dated 25th
*November*, 1678.

4. An *Indian* deed to *Cornelius Van Dyke* and *Marte*
*Garretse*, for land now known by the name of *Corlairs-*
*kill* patent.

5. A patent to *Helmer Jansen*, for the tract of land as
described in the *Indian* deed to *Guysbert Outen Bogart*,
bearing date, *January* 15, 1703, which recited, among
other things, that *Guysbert Outen Bogart*, the father-in-
law, and *Mary Jokinse*, the mother of *Helmer Jansen*,
on the 18th *February*, 1688, conveyed the same premi-
ses to the said *Helmer Jansen*, the grantors having then
been in possession above twenty years.

6. A writ of *escheat* and inquisition, dated 15th and
17th *September*, 1733, whereby it was found that *Hel-*
*mer Jansen*, died seised in fee of the premises in ques-
tion, leaving no heir ; by which the crown became seised
thereof, and continued so seised, until *August* 22, 1738,
when a patent for the lands described in the *Indian* deed
to *Guysbert Outen Bogart*, and in the patent to *Helmer*
*Jansen*, was granted to *John Lindsay*, reciting all the
preceding facts.

The defendant in error deduced a regular title under
the patent to *Lindsay*, to one *Egbert Bogardus*, deceas-
ed, the father of the lessors ; and he proved that *Bogar-*
*dus* left three sons, the lessors, and a daughter ; and by
his last will and testament, devised the premises in
question to the lessors.

In *August* 19, 1741, *Vincent Matthews, Gerrit Van*
*Bergan, Martin Van Bergan, Cadwallader Colden* and

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

*George Clarke,* the grantees of *John Lindsay,* the paten-tee, entered and made partition of parcel of the said tract of land, and held in severalty the lots divided, ac-cording to their several rights under the partition. The partition deeds contained a covenant mutually to share the expense of defending their title against other claim-ants of the same land.

In 1752, *David A. Abeel* and *William Van Bergan,* took possession of *Lindsay's* patent, under the patent, and for the benefit of the proprietors, claiming under it. On the 12th *January,* 1773, the then proprietors, (among whom was *Egbert Bogardus,* the father of the lessors,) made a partition of the residue of the *Lindsay* patent, on which partition, the lot No. 12, among others, be-came the several property of *Egbert Bogardus.* The said lots, in whole or in part, were then and now are severally held by the said proprietors, or those claiming under them; and the greater part have since been pos-sessed by *Bogardus,* according to that partition.

The defence set up, on the part of the plaintiff in error, who was the defendant below, was: 1. That the premises in question were comprehended in an elder patent, called the *Catskill* patent; and

2. That there had been an adverse possession, under that patent, by him and those under whom he claimed, for more than twenty years.

To establish his first point, the plaintiff in error pro-duced the patent, called the *Catskill* patent, granted by governor *Dongan,* on the 29th *April,* 1588, to *Eliza-beth Van Dyck* and *Martin Garritson.* This patent re-cites a purchase made by *Silvester Salisbury* and *Martin Garritson,* of the native *Indian* proprietors, on the 8th *July,* 1678, of " a certain tract of land with the appur-tenances, lying, situate and being at a certain place call-ed *Catskill,* in the county of *Albany,* on the west side of *Hudson River,* and on the south and north side of the creek or kill, consisting of five great plains, the first

IN ERROR.

ALBANY,
Feb. 1809.

VAN GORDEN
v
JACKSON.

called *Wachachkeek*; the second *Wichquannacktekak*; the third *Pachquaick*; the fourth *Assiskowachkak*, and fifth, called *Potic*; together with the wood land adjoining to the said plains, extending four *English* miles from the said plains; that is to say, four *English* miles from the said plains, eastward; four *English* miles northward from the said plains; four *English* miles westward from the said plains; and four *English* miles southward from the said plains; (the land of *John Bronk*, out of the premises, only excepted.) It recites also, a former grant, or patent, from Sir *Edmund Andross*, of the 26th *March*, 1680, (said to be for the same premises,) and a petition of the grantees, for a more full and ample grant of the premises, and a more certain limitation of the estate, than was contained in the former grant. It then goes on to give, grant, ratify and confirm to the patentees, in the manner therein mentioned, all the above recited and mentioned tracts of land and premises, butted and bounded, containing and extending as before expressed, with their and every of their appurtenances, to be holden in socage, subject to the yearly rent of one bushel of wheat.

The deed executed by the *Indians*, and the patent from Sir *Edmund Andross*, referred to in the *Catskill* patent, conveyed only the five plains above described, and the woods around the same, containing, by estimation, in *circumference*, one *Dutch* mile.

It appeared further, in evidence, that on the 13th of *June*, 1684, *Cornelius Van Dyke*, who had married *Salisbury's* widow, and *Martin Garritson*, obtained a deed from certain *Indians*, whereby they declare the land consisting in five plains, besides the woods surrounding the same, lying *one Dutch mile* east, west, north and south, is the true property of *Salisbury* and *Garritson*; but that as the *Indians* pretend that they have some right beyond the mile, stretching as well eastward, towards the river side, as northward, towards the great

IN ERROR.
........
ALBANY,
Feb. 1810.

VAN GORDEN
v.
JACKSON.

plain, which was formerly bought by Captain *Cloot* and others; they therefore sell to *Van Dyck* and *Garritson*, all the lands which might lay out of the limits of their former purchase, that is to say, more than *the mile in circumference*, before bought, stretching eastward, towards the river side, so far as the right of *Guysbert Outen Bogart*, and northward, up from a certain kill, called *Stuck*, where the right of *Outen Bogart* ends, along the river up northward, to the *Vlaught Hook*, by the *Indians* called *Machawamick*, further stretching along the right of Captain *Cloot*, deceased, and others, to the old *Catskill* road, under the hills, and so further to the former right of *Catskill*, heretofore bought by Captain *Salisbury*, deceased, and *Martin Garritson*.

The plaintiff in error contended, that the location of the *Catskill* patent, ought to be made as follows : that its out bounds should run in such manner round the plains, as that with a line of four miles long, you would always be able to touch some part or other of the exterior boundary of the said plains, from any one point in the out bounds of the patent ; this construction, he said, was adopted by the commissioners, who divided the *Catskill* patent in 1767, and this location, as appeared by the map of the division, will include the premises in question. The plaintiff in error below, also exhibited two other modes of locating the said patent, so as to include the premises in question, and which were explained by diagrams, exhibited on the argument of the cause. In support of this construction, he produced *Christopher Tappen* and *Leonard Bronck*, two surveyors, as witnesses, who agreed that the location, adopted by the said commissioners, was one that was practicable, and in their opinion, made agreeable to the intention and import of the grant.

He also gave in evidence, an ancient return of a survey, made in the year 1719, by one *John Beatty*, the then deputy surveyor-general, as made pursuant to an

IN ERROR.
........
ALBANY,
Feb. 1809.
VAN GORDEN
v.
JACKSON.

order for that purpose, issued by *Peter Schuyler*, the president of his then majesty's council, for the province of *New-York*, on the petition of *Gerrit Van Bergan*, the eldest son of *Martin Garretse*, one of the patentees, named in the before mentioned patent, and of *Francis Salisbury*, also named therein. This survey was protracted by *Christopher Tappen*, who testified, that the said commissioners, in running out the boundaries of the said last-mentioned patent, discovered on its north and south bounds, a line of ancient marked trees, a little outside of the line run by the said commissioners, but corresponding to it in form, which they supposed to be trees marked by the said *Beatty*, when he made his survey as aforesaid. To show the contemporaneous exposition that had been given to the said patent, the plaintiff in error produced and read in evidence, an order, dated 22d *August*, 1717, made by the then council of the province of *New-York*, setting out a patent to *Henry Beekman*, and giving two courses along the bounds of the *Catskill* patent ; also a patent of the same date, for the same lands, to the said *Henry Beekman*. This patent is known by the name of the *Kiskatamanatje* patent, and is at the distance of four miles from the plains.

He also called several witnesses, to wit : *Christopher Tappen*, *Nicholas Van Schaick*, *Stephen Landtman*, and *Peter Brandow*, who testified, that along and up to the west, northwest and north bounds of the *Catskill* patent, were ancient possessions made from forty to eighty years ago, which were originally taken under the *Catskill* patent, and still continue to be holden under it.

He also gave in evidence, two leases, dated 22d *April*, 1749; one executed by *Martin* and *Gerrit Van Bergan*, sons of *Martin Garretse*, one of the patentees ; the other, by *Francis Salisbury*, son of the other patentee, both to *John Spoor*, for lands between three and four miles from the plains, and a lease to *James Taylor*,

*IN ERROR.*
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

dated 19th *February*, 1735-6, for all the lands contained in *Lindsay's* patent; which lease was executed by *Martin*, and *Gerrit Van Bergan* and *Francis Salisbury*.

He also produced written and parol evidence, of very ancient possessions under the *Catskill* patent, in that part of it where the premises in question lie. *Nicholas Van Schaick*, a witness, also testified, that no part of *Elizabeth Banker's* patent had ever been possessed by her, or any other person claiming under her, but had always been possessed under the *Catskill* patent; and that part of *Lydias's* patent, which interfered with the *Catskill* patent, was held under it; that one *Price*, who had originally held his farm under the patent of *Lydias*, when he found that part of it was included within the bounds of the *Catskill* patent, as claimed by the defendant, in the court below, purchased from the proprietors, that part of his farm which was included within its bounds, as above.

The judge, at the trial, rejected the construction of the *Catskill* patent, set up by the plaintiff in error, and adopted that before sanctioned by the supreme court; that is, by running lines of four miles in length, due north, south, east and west, from the extreme northern, southern, eastern and western parts of the plains, and closing those lines by straight lines from the extremities.(*a*)

Besides the patents above stated, produced by the defendant in error, at the trial, several other patents were also given in evidence, as interfering with the *Catskill* patent, to wit: *William Loveridge's* patent, dated 8th *February*, 1687. *Corlair's kill* patent, dated 23d *May*, 1687. *Jacob Lockerman's* patent, dated in 1695. The *Kiskatamanatje* patent, granted to *Beekman* and *Livingston*. *Elizabeth Banker's* patent, dated 20th *August*, 1691. *Van Vechten's* patent, *Lydias's* patent, and the

(*a*) See the case of *Jackson, ex dem. George Clark*, v. *Reeves*. (3 *Caines's Rep.* 293. 299.)

*Vlacte* patent; all of which, except *Banker's*, *Van Vech-ten's* and *Lydias's* patents, were marked out on a map, produced at the trial.

In regard to the second point, as to the *adverse* possession, there was various and contradictory evidence, which it is unnecessary to state.

The judge, before whom the cause was tried, charged the jury, that by a just construction of the *Catskill* patent, the premises in question were not included in it; that evidence of possession, to defeat the title of the defendant in error, should be such as to establish a peaceable and unequivocal adverse possession, for twenty years antecedent to the commencement of the suit; but he submitted it to the jury, at the same time, intimating to them his opinion, that the evidence did not make out such an adverse possession. To this opinion, the plaintiff in error excepted, for the following reasons :

1. That the judge ought to have charged the jury, that by a just construction of the *Catskill* patent, the premises in question were included in it.

2. That he ought to have charged the jury, that the evidence of adverse possession was sufficient to bar the plaintiff's right to recover.

3. That it was clearly proved, that the defendant below held the premises adversely, at the time of the death of *Egbert Bogardus*, so that nothing passed by his will, and the lessors derived no title under it.

4. If the lessors claimed by descent, then the plaintiff below was entitled to recover three-fourths only of the premises, as *Egbert Bogardus* left four children, and three of them only were made lessors of the plaintiff.

On the *bill of exceptions* tendered to the judge, a writ of error was brought to this court.

It was contended, on the part of the defendant in error, 1. That even if the *Catskill* patent was not founded in fraud and misrepresentation, yet that it ought to receive

*IN ERROR.*
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

a strict interpretation; and that it will be fully satisfied by the construction adopted at the trial; and that it ought, probably, to be more narrowed in its extension.

2. That all the ancient documents, contemporary with the *Catskill* patent, demonstrate that the extent, attempted to be given to that patent by the plaintiff in error, was not originally contemplated; and that no idea was entertained of its interfering with *Outen Bogart's* land, afterwards granted by patent, first to *Jansen*, and subsequently to *Lindsay.*

3. That the doctrine laid down by the judge, as to the adverse possession, was correct and consonant to the rule of law on the subject.

4. That the question, whether such an adverse possession had been proved, was properly submitted to the jury; and that the expression of his opinion on a matter of fact, was not binding on the jury, nor the proper subject of a bill of exceptions.

The cause was argued, at great length, by *Van Vechten* and *T. A. Emmet,* for the plaintiff in error; (*Foot* was also on the same side;) and by *Harison* and *Henry,* for the defendant in error; but as it would be impossible to understand what was said, without a reference to the maps and diagrams, exhibited to the court, their arguments are omitted.

The counsel for the plaintiff in error cited *Jackson* v. *Dennis,* (2 *Caines,* 177.) as to the boundaries of *Hosick* patent.

The counsel for the defendant in error cited 4 *Bac. Abr.* 210, 211. *Prerog.* 4. as to the construction of grants from the crown; the case of *Penn* v. *Baltimore,* (1 *Vesey,* 444. 453.) Lord *Hardwicke's* opinion, as to the location of twelve miles in a circle round *Newcastle;* *Jackson* v. *Reeves,* (3 *Caines,* 293. and 1 *Johns. Rep.* 156.)

The. CHANCELLOR. This cause comes before the court on a bill of exceptions, taken at a ⁻circuit court in *Greene* county, which bill, after stating the evidence produced, and the opinion of the judge before whom it was tried, contains exceptions to the opinion ; because,

IN *ERROR*.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

1. The court ought to have charged the jury, that by a just construction of the *Catskill* patent, the premises were included in it.

2. That the judge ought to have charged the jury, that the evidence of adverse possession, given on the part of the defendant below, was sufficient to bar the plaintiff's right to recover.

3. That as it was unequivocally proved, that the de= fendant in the court below, held the premises in question adversely, at the time of the death of *Egbert Bogardus*, the court ought to have charged the jury, that nothing passed by the will of *Egbert Bogardus*, and that the les- sors of the plaintiff could derive no title to the premises in question through it.

4. If the lessors of the plaintiff claimed by descent, then the plaintiff in the court below was only entitled to recover three-fourths of the pren ._.s in question, *Egbert Bogardus* having left four children, only three of whom are lessors to the plaintiff in the court below.

The counsel for the parties have agreed, that the several patents, maps, *Indian* deeds and leases, certi- fied or office copies of the writ of escheat, inquisition and return, and all other papers and documents that were read in evidence on both sides, in the case of *James Jackson*, ex *dem. George Clark*, against *John Reeves*, shall be considered and made part of the bill of exceptions in this case.

The first exception imposes it upon this court, to seek for, and apply the proper construction of the *Catskill* patent ; for that patent being the oldest in date, as re- spects this controversy, is to be first satisfied, and is ex=` pressly made an object of inquiry by the exception,

*IN ERROR.*
.......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

The two patents, of which the construction of the one and the existence of the other, as operative grants, are to be determined on, differ in one respect; for the location of *Lindsay's* patent is admitted to be correct, and to cover the lands granted to *Helmer Jansen*, as possessed by *Outen Bogart*, which relieves the inquiry from some embarrassment; for, whatever may be the bounds of the *Catskill* patent, those of the *Lindsay* patent are not drawn into controversy, and are admitted to cover the premises in question.

The judge, to whose opinion the exceptions have been taken, has not, as appears from the bill, laid down any construction of the *Catskill* patent; he charged merely, " that by the just construction of the *Catskill* patent, the premises in question were not included in it."

The question of construction is, therefore, on this bill, so far at large before the court, that if upon any just construction, the premises in question can be included in the *Catskill* patent, the plaintiff has sustained his first exception.

The construction of the bounds of the *Catskill* patent, are to be collected from itself, if it affords sufficient certainty to admit of it; if not, from the contemporaneous acts of the parties immediately interested, from the acts of the government, as far as it affected its own rights; and the acts or even the acquiescence of the patentees, and those deriving such interests as constituted them privies, as connected with those acts of government, are to be admitted to explain ambiguities.

Many of the transactions to be examined, relate to a remote day; since which, the country, its inhabitants, modes of thinking, and doing business, on the subject of grants and lands, have so completely changed, as to render it a difficult task, in many instances, to ascertain, satisfactorily, the weight which ought to be ascribed to any particular act, perhaps, discoloured by the medium through which it has reached us, partially understood,

or totally misapprehended. On these, however, it may become necessary to pass our judgment; the first exercise of which is rendered more difficult, by the admission of a large mass of evidence, seldom presented in the same extent and complexity, from a court of law to this court.

IN ERROR.
........
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

Though no question has arisen on the subject of the bounds of *Lindsay's* patent, as some of the written evidence connected with it is of a date anterior to the granting of the *Catskill* patent, and as it may influence the construction of the *Catskill* patent, I shall in the first place examine that evidence, before I proceed to that of the *Catskill*.

The *Indian* deed of *Curpewaen*,\* an *Esopus Indian*, who, *in behalf of himself and other savages of Esopus*, who might form any claim, conveys to *Guysbert Outen Bogart*, certain parcels of land *on which he then lived*, running from *Boomtjes hook*, up the river to the north, to a certain brook named *Stuck*, &c.

\* 26th *June*, 1684.

This grant was made before *Marte Garretse* and *Cornelius Van Dyck*, then justices, and attested by *Robert Livingston*, whose official description does not, however, appear in the deed; but who appears, from other papers in evidence, to have been secretary of the commissaries, and, afterwards, clerk of *Albany* county; but at what time he ceased to be secretary and became clerk, is not in evidence.

On this grant is a memorandum, dated the 2d *February*, 1698-9, subscribed with the letters *R. L.* in the following words: " This piece of wood-land, belonging to *Guysbert Cornelius Bogart*, and on which he lived many years before, and contains about one and a half morgan of land; this parcel of land is given to the said *Bogart*, by *Dirck Hendricks De Gayer*, and by *Jacob Tennisse*, alias *Cobus* the runner, as appears by private writings; this has been exhibited by *Helmer Jansen*, who purchased the right of *Guysbert Bogart* and *Maria Jockinse*, his wife."

IN ERROR.
.......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

The patent to *Helmer Jansen*,* recites his petition, in which he states that *Guysbert Bogart*, his father, and *Maria Jockinse*, his mother, had, by deed, bearing date the 26th day of *June*, 1684, made and signed before the magistrates of the city of *Albany*, purchased of the native *Indians*, a certain parcel of land, (*describing it*,) whereof they had then had the quiet and peaceable possession for above twenty years, without obtaining any grant for it; also another small piece of land, about *three acres*, &c. The location of the small piece of land, has not been attempted; but, from the quantity, it would seem to be the same land mentioned in the memorandum endorsed on the *Indian* deed.

* 15th *January*, 1703-4.

This patent, as the act of government, connected the *Indian* title acquired by *Outen Bogart*, with the grant to *Jansen*, recognised its efficacy as an *Indian* deed, and affirmed the possession under it, from the representation of the grantee, which it admits to be true, as to its own interests.

The death of *Helmer Jansen*, and the escheat in consequence thereof, have no bearing on this point, and are not here necessary to be adverted to, as it is my intent, in the first place, to confine myself merely to the ancient transactions contemporaneous with, or prior to the granting the *Catskill* patent and confirmation.

† 27th *March*, 1680.

The letters patent† to *Elizabeth Salisbury* and *Martin Garritson*, recite, that whereas Captain *Silvester Salisbury*, late commander of *Albany*, made application for a grant for a certain parcel or tract of land, *for his children*, lying at the *Catskill*, on the west side of the *North* or *Hudson River*, the which he, together with *Martin Garritson*, one of the commissaries of *Albany*, with the leave and approbation of the said governor, purchased of the native *Indian* proprietors, and made payment for the same, whereupon the said *Indians* transferred their interest to the said *Silvester Salisbury* and *Martin Garritson*, upon the 8th day of *July*, 1678, before the com-

missaries of *Albany*, the said parcel or tract of land, lying at *Catskill* as aforesaid, above the land of *Eldert De Gayer*, consisting of five great flats or plains, on both sides the creek or kill, (naming the said flats,) together with the wood-land, for out drift of cattle, containing by estimation, *in circumference* four *English* miles, or one *Dutch* mile, including " all the kills, creeks, brush or wood-land and dependencies, the land of *John Bronk*, excepted ; and which was given away before by the *Indian* called *Schermerhorn* ; there being by computation in the said parcel or tract of land, 100 morgan or 200 acres of improvable land ;" and grants to *Elizabeth Salisbury*, widow of Captain *Silvester Salisbury*, in trust, to and for the use of his children, and to *Martin Garritson*, in partnership, their heirs and assigns for ever, the said premises.

As explanatory of the bounds of this patent, the *Indian* deed, therein referred to, has been produced ; by which the grantors therein named, *Catskill* and *Makekendes Indians*, convey to Captain *Salisbury*, commander, and *Martin Garritson*, commissary, a certain parcel of land, lying at *Catskill*, above the lands of *Eldert De Gayer*, consisting in five great plains, on both sides of the creek, (naming them, as in the patent,) with the wood-land, for out drift of cattle ; otherwise meaning, to wit, four *English* miles round about the aforesaid *lands*, except the land of *John Bronk*, reserved out of it.

This *Indian* deed, from the words *four English miles round about the said lands*, left the precise extent and shape of the wood-land exceedingly questionable ; and, being in a language with which the *English* officers of government were, probably, not conversant, is subject to much doubt and difficulty. But the patent is their practical exposition of its import ; and though they might be mistaken as to the extent of a *Dutch* mile, and as to the precise import and meaning of the *Dutch* words

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

IN ERROR.
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

used in describing the premises intended to be granted, they could not be at a loss to express their construction in the language of the government. The grant was for the five flats, distinguished as improvable land, together with the wood-land, for out drift of cattle, containing, by estimation, in circumference, four *English*, or one *Dutch* mile.

The word *land*, in the *Dutch* language, it is well known, conveyed the same sense, with its present technical acceptation, where it is used simply. It meant arable land and no other was considered as arable, but the rich low lands, or flats.

There are no words, either in the *Indian* deed, as translated, or in the patent, which impose an extension of the wood-land beyond the circumference of four miles, measured in the exterior lines ; for the words *round about*, in the translation from the *Dutch*, are more equivocal, and are, perhaps, capable of being applied to a surface extending four miles from every part of the flats, or to the more limited construction given by the government, in their patent ; that, as clearly expressing the sense of the government, at the moment they made the grant, must unavoidably control.

The grant is limited to four miles *in circumference.* It has been urged, that a liberal construction would exclude the flats ; and that a circle is the only location, which can satisfy the terms in which it was made. But the word *circumference*, in its obvious, and only sense, must be measured on the exterior line surrounding the flats. Nor does it convey any determinate idea as to shape, for in its common application, as to an island, which has some analogy to the present case, the most discerning mind could not, from the information that it was four miles in circumference, determine whether it was round, triangular, or square ; for the term would be equally and properly used in all those cases,

for describing the extent of the line along the water
board.

It is not possible to draw a circumference without comprising the flats in it. How this line was to run, whether circular, elliptical, or strictly correspondent to the sinuosities of the flats, it is not necessary to inquire. For in whatever shape located, it could not possibly extend to the premises in question, on any construction that can be assumed, especially, if the flats, from one extremity to the other, must approach, and perhaps exceed two miles, for so the map in evidence indicates.

The acts of government, intermediate the obtaining the patent and confirmation, apparently acquiesced in by the purchasers named in the first deed, or their representatives, have some bearing on this part of the subject, especially, when it is taken into view, that the persons against whose interests they are supposed to have operated, appear, from the evidence before the court, to have been of consideration, intelligent, vigilant, and capable of comprehending and asserting their rights.

During that period several patents were granted, covering all the land east of the *Indian* foot-path, and north of the *Catskill*, or creek, and all the land on the south side of that creek, along the river, extending somewhat farther from it than the foot path, as described on the map, comprised in the eighth division, *Outen Bogart's* land only excepted.

There is no evidence that the passing these grants was resisted on the part of the proprietors of *Catskill* patent. I think it was admitted in argument, that no part of the lands comprised in these patents, was held under that patent, and there is no evidence before this court that they were.

The patent to *Van Vechten* was granted in 1686, and *Corlair's, Loveridge's Lockerman's*, and *Bronk* and *Garritson's*, in 1687.

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

In the latter patent, *Martin Garritson* appears to have been a patentee, and as the grant was obtained after the death of *Salisbury*, an attempt has been made to separate the acts of *Garritson* from those of the persons who derived under *Salisbury*, as originating in fraud, and as an evidence of his sacrificing the interest of the wife and children of *Salisbury*, to promote his own, in the obtaining that patent. But though this is rather a late day, after a lapse of more than a century, to examine a subject of that kind, the patent itself bears strong evidence to repel the attempt, as it discloses the grounds upon which it issued, and clearly shows, that it was bottomed on antecedent rights, acquired by purchases from the *Indians*, and patents, under rights which had regularly been vested in the grantees.

The patent of *John Bronk* and *Martin Garritson* bears date the 23d day of *May*, 1687, and contains several recitals of the *Indian* purchase of 1662, of a patent of the 11th day of *June*, 1667, of a patent to *John Cloot*, *Jurian Tennisse* and *John Hendrick De Bruyn*, dated the 25th *May*, 1667, and of a purchase of a piece of land, *beginning from the property of Guysbert Outen Bogart*, the titles to which are said to be vested in the patentees, all of which are regranted and confirmed by the patent, which covered the whole of the lands north of *Outen Bogart's*, and on the east side of the foot-path; and, I think, affords some evidence that the *Indian* deed to *Garritson* and *Van Dyck*, was intended to be applied as well to the extinction of the *Indian* claims on the lands afterwards granted to *Bronk* and *Garritson*, as to the purposes of the proprietors of the *Catskill* patent.

The precise locations of the several parcels, comprehended in that patent, it is not material, in the present controversy, to ascertain. They were all included in the confirmation, and are collectively laid down on the map, as bounded *by the Catskill Indian foot path*, which was, in argument, admitted to be the same with the

*old Catskill road under the hill*, described in the *Indian* deed to *Garritson* and *Van Dyck.*

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

The patent to *Garritson* and *Elizabeth Van Dyck* was dated subsequent to all these grants ; and at the time it was obtained, some of the lands eastward of the flats, (clearly covered by the former grant to *Elizabeth Salisbury* and *Van Bergan*,) if the construction of the patent contended for could not prevail, were possessed by *Bronk*; by *Tennisse*, who, it appears, had a mill on the land held by him ; by *Degayer*; by *Outen Bogart*, and some others.

Where the land of *John Bronk* was, does not appear. The second *Indian* deed was, however, prior in date to all the patents I have enumerated, not among those described as intended to be confirmed, but so near the time of obtaining them as to leave no doubt, from the situation of the parties, their connexion with the government, and the acts they were required to perform, as public officers, at the place in which the records of public transactions were then kept, that they were fully apprized of the steps taken to appropriate the land, which afterwards became an object of claim, by the persons succeeding to their rights.

Two *Indians*, describing themselves as heretofore owners of the lands of *Catskill*, formerly bought by Capt. *Salisbury* and *Martin Garritson*, professing to act for all *Indians* who had any pretensions on *Catskill*, appeared before *Derick Wessels* and *Jan Janse Bleacker*, justices of the peace for *Albany* county, and declared that the said land, consisting in five plains, besides the woods surrounding the same, lying one *Dutch* mile east, west, south and north, is the true property of Capt. *Salisbury*, deceased, and *Martin Garritson :* they then declare, that as the said *Indian* owners pretend that they have some right beyond the mile, stretching as well eastward, *towards* the river side, as northward, towards the great plain, which was formerly bought by

*June 18, 1684.*

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

Capt. *John Cloot*, deceased, *John Bruyn* and *Jurian Tennisse*, that they, therefore, have now sold, as they do by these presents sell, &c. to *Cornelius Van Dyck* and *Martin Garritson*, their right of land, as well arable as wood land, kills and creeks, with their appur‑ tenances and dependencies, nothing in the world ex‑ cepted, which might lay out of the limits of their for‑ mer purchase ; that is to say, more than the mile *in circumference*, before bought ; stretching eastward, to‑ wards the river side, *so far as the right of Guysbert Outen Bogart*, and northward up from a certain kill, called *Stuck*, where the right of the said *Outen Bogart* ends, along the river, northward, to the *Vlught Hook*, by the *Indians* called *Machawamick*, further stretching along the rights of Capt. *Cloot*, deceased, *Jan Bruyn* and *Ju‑ rian Tennisse, to the old Catskill road under the hills*, and so further, to the former right of *Catskill*, heretofore bought by Capt. *Salisbury*, deceased, and *Martin Gar‑ ritson*.

This *Indian* deed, to which *Cornelius Van Dyck* and *Martin Garritson* were parties, it appears, was intro‑ duced as evidence on the part of the defendants, as ex‑ planatory of the bounds of the patent under which the plaintiff claims. It would seem to have been intended, to obtain a recognition of the transfer of the *Indian* rights to the land described in the former deed, to give it extension beyond its bounds, and to be exhibited as an evidence to government of the acquiescence of the *Indians* in such extension, and affords an exposition of the bounds of the land comprehended in the patent of 1680.

*July* 28, 1688. The patent to *Elizabeth Van Dyck* and *Martin Gar‑ ritson*, which I shall, for the sake of distinguishing it from the other, *only*, call a confirmation, recites the pur‑ chase of the *Indians*, of the 8th of *July*, 16:8, de‑ scribed in the words contained in it ; but adds, that is to say, four *English* miles from the said plains, eastward,

four *English* miles northward from the said plains, four *English* miles westward from the said plains, and four *English* miles southward from the said plains, and refers to the deed, as showing it. It recites the death of *Silvester Salisbury;* that his wife survived him ; that she had since intermarried with *Cornelius Van Dyck,* who was then deceased; deduces her rights from him, and that she, together with *Martin Garritson,* had prayed *a more full and ample grant, and confirmation* of the premises, as also a more certain limitation of the estate, expressed in the former grant. It gives, grants, ratifies and confirms unto the said *Elizabeth Van Dyck* and *Martin Garritson,* that is to say, to the said *Elizabeth,* for and during her natural life, with remainder in fee, to *Francis Salisbury, Silvester Salisbury* and *Mary Salisbury,* children of *Silvester Salisbury.*

The description in the last *Indian* deed is in part adopted in the recitals of the confirmation, an evidence that it had been exhibited to government, as explanatory of the original deed, on which the former patent issued, for the purpose of enlarging and defining its boundaries.

As to the act of the parties under whose title the plaintiff claims, he cannot be permitted to question the interests of the persons who, by his own showing, having been concerned, either as parties or privies in the transactions brought into view, to corroborate his title. The title of *Salisbury,* the patentee, after the interposition of the estate for life of his widow, which must have long since expired, was permitted to descend to the persons for whose use a moiety of the lands comprised in the first patent, was professedly made, that is, *his children;* and the acts of *Elizabeth,* his widow, and her second husband, *Van Dyck,* are so intimately blended with the whole course of the transaction, as to render them inseparable from those of *Garritson :* but if they were not *Garritson's* acts, yet as a party in interest with them, they

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

would be admitted a legitimate source of construction, as applied to the interests of both.

Whether the confirmation is to be construed as an attempt at a remodification of the quantity of the estate, or as a confirmation for the land granted by the first patent, or was intended as an enlargement of the boundaries, are subjects which it might be necessary to consider, if the course of examination presented them. But it is not requisite here to distinguish between them. I shall primarily assume the confirmation, the only point of view in which it can be considered as material, in considering the boundaries, as granting and confirming the land covered by the first patent, and legally competent to vest the lands beyond it, included in the confirmation, in the grantees.

This second *Indian* deed, in my opinion, is a very important document, to aid in giving a construction to the bounds of the confirmation.

If the first *Catskill* patent was circumscribed in the mode, I think it ought to be located; and if the location, by a line of four miles in circumference, is the only one in which it can be satisfied, it follows clearly, that no part of the premises could be included in it, for the nearest point to the flats, as appears from the map, would be more than two miles from them.

The confirmation, if it passed the rights of the crown, would only pass such as were in it at the time of the grant. It could not devest the title acquired under former royal or ducal grants. For though *Indian* deeds were obtained for the purpose of proving that the rights of the natives were extinguished, in every stage of the colonial government they were subject to some species of regulation, to prevent imposition, and were never admitted, as of themselves, to be a source of legal title. They were presented to government as an inducement to extend its bounty by grant; but the firm and unbending principle has uniformly been, that all titles must

4

be derived, either mediately or immediately, actually or presumptively, from the crown.

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
V.
JACKSON.

The *Indian* deed of 1684 describes the land intended to be granted as stretching eastward, towards the river side, so far as the right of *Guysbert Outen Bogart*, and northward up from a certain kill called *Stuck*, where the right of the said *Outen Bogart* ends, along the river, northward to the *Vlught Hook ;* further stretching along the right of Capt. *Cloot*, deceased, *Jan Bruyn* and *Jurian Tennisse*, *to the old Catskill road*, and so further to the former rights of *Catskill* heretofore bought by Capt. *Salisbury*, deceased, and *Martin Garritson*.

The premises in question are admitted to be part of the land of *Outen Bogart*, and the map of *Lindsay's* patent, in evidence, by consent of parties, as part of the bill of exceptions, lays down *Stuck*, or *Riz*, at the *Hudson* river, at the north-easternmost corner of that patent, from which it is to extend northwardly to the *Vlught Hook*.

Where the *Vlught Hook* was, does not appear in evidence. That it was to be found on the bank of the river, and to the northward of *Stuck*, is apparent, and from other parts of the description, it would seem to be somewhere in the bounds of the second tract, north of *Outen Bogart's*, covered by the patent of the 23d day of *May*, 1687, to *Bronk* and *Garritson ;* for that tract is described as the right of *Cloot*, *Bruyn* and *Tennisse*, as acquired antecedent to the year 1684 ; thence, in the words of the description, stretching along the right of Capt. *Cloot*, deceased, *Jan Bruyn*, and *Jurian Tennisse*, to the old *Catskill road ;* and so further to the right of *Catskill*, heretofore bought by Capt. *Salisbury* and *Martin Garritson*. This last stretch carries it to *Salisbury* and *Garritson's* patent, in whatever manner located ; and whether the land between *Outen Bogart* and the second tract, or the tract marked *Cloot* and company, on the map, was intended ; for, in either case, the direction westward would touch it.

The word *stretching*, in its common use in grants, during the early periods of the *English* colonial government here, was applied either to the extent of a single line, or of a *rolling* location, in which the breadth being described by lines on surfaces, was carried with such breadth, to the object described, as its *terminus*; this appears to have been intended as a *rolling* grant, in that part of the description now under consideration.

If this exposition is correct, it tends to show the extent of the grant to the eastward; in that direction, *Martin Garritson* had acquired, by transfer or purchase, pretensions to several parcels, perhaps undefined in extent. The *Indians* claimed part of these lands, and part of the lands claimed by the patentees, or their representatives, under the first *Catskill* purchase; the total extinguishment of their rights as to both must, at least, have been interesting to *Martin Garritson*. The explanatory deed is obtained, which covers the whole of *Martin Garritson's* pretensions, and extends the *Catskill* rights, as depending upon *Indian* purchases, four miles round the flats, where it does not interfere with the lands already patented; but by some miscalculation, as to distance, or some construction of the patent, then, it seems not doubted, the land of *Outen Bogart* was excluded; for *all this is said to be beyond the mile round about the plains;* and in the description in the *Indian* deed, after arriving at the *Catskill* road, it is said still to run further before it touches the *Catskill* right.

But it may be said, the *Indians* also pretended a right beyond the *Dutch mile*, stretching as well *eastward* towards the river, as northward towards the great plains, which was formerly bought by Captain *John Cloot*, *Jan Bruyn* and *Jurian Tennisse.*

If these great plains mean the patent already mentioned as the second tract in the patent of *Bronk* and *Garritson*, it will be seen, by inspection of the map, that they lie to the southward of east; but if the great plains are in

the tract marked on the map, as *Cloot and company*, of
which there is no evidence, either from similarity of
names, or the nature of the land it comprises, it re-
quires an extension east of north-east from the flats, to
reach them, which affords some criterion for estimating
the accuracy with which the points of compass were at-
tended to in these descriptions.

From the *Indian* deed, taken in connection with the
confirmation, the former, showing the sense of the pur-
chaser, the latter, combining their sense with that of
government, it appears to me, a decisive fact is to be
collected; that in whatever mode the lands granted by
the confirmation were to be located, *the right of Outen
Bogart was not included in them.* The right of *Outen
Bogart*, forms one of the boundaries of the *Indian* deed;
and it is so far incorporated in the description, as to give
a line some extent northwardly, along which it ran
to *Stuck;* this right, I have already shown, had been
so far recognised by government in its patent to *Bronk*
and *Garritson*, as to describe it *as his property.*

The same words of extension, are included in both
the *Indian* deed and confirmation; and by whatever
cause produced, they ought, it appears to me, to receive
the same construction.

To illustrate my construction; suppose a rolling patent,
described as extending from the west bank of the *Hud-
son*, with the breadth of *State-street*, two miles, to the
*State-house*, with an apt description, so as to leave no
doubt that the building in which this court now sits, was
the house intended, and which we will suppose half a
mile from the river; is there any principle to be dis-
covered, either in law or sound construction, which
would warrant the including the house and all the land,
in the same breadth, and a half mile beyond it?

'- The second *Indian* deed for the *Catskill* lands, bears
date the 13th day of *June*, 1684; that to *Outen Bogart*,

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

on the 26th of the same month; though called a deed, it is a testimonial in the nature of a notarial act, and such was the mode in which *Indian* purchases were uniformly made before the commissaries, and after their abolition, by the justices who succeeded to their powers.

This second *Indian* deed for the *Catskill* lands, was made before *Martin Garritson* and *Cornelius Van Dyck*, as justices; who, from the nature of the transaction, appear to have been officially required to give it their sanction, as having been fairly obtained, and from whom, it is to be inferred, it was exacted as a duty to know the instrument thus formed under their superintendance.

It therefore differs materially, in all its circumstances, from the modern attestation of a deed; for now the import and object may, and frequently are, wholly unknown to the witnesses, who attest its execution; but here the very men who had, only thirteen days before, made the purchase which formed the basis of the confirmation, if they did not frame the instrument, at least superintended its consummation, by giving their official testimony, that it was fairly conducted; the object of which purchase, it is now contended, was comprehended in the bounds of the second *Indian* deed, and of the confirmation.

This is strong ground in corroboration of the construction, that the premises in question were not intended to be included in the confirmation.

To this may be added, the permitting *Outen Bogart* to remain in possession of the lands he had thus purchased; to transmit them to *Helmer Jansen;* to suffer him to obtain a patent for them; to enjoy them peaceably under that patent; to suffer not only the derelict possession, from the time of his death till office found, to remain unclaimed; but to acquiesce in the patent of *Lindsay* till 1755.

IN ERROR.

......

ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

What the legal effect of their long possession is, does not fall under this object of consideration ; it is thus cursorily adverted to, in connection with the general conduct of the parties.

The sense of government has been supposed to have a powerful bearing on the controversy. I have admitted its sense, in some respects, to aid the construction which I suppose a correct one.

The government, intermediate the first patent and confirmation, it has been shown, made several grants within the range of the location of the *Catskill* patent, as contended for on the part of the plaintiff; those appear to have been acquiesced in on the part of the proprietors of the *Catskill* patent; at least there is no evidence in this cause, that they took any possessions under it, interfering with those patents.

As far as the acts of government are combined with the acts of the parties, or the acts of the parties do not run counter to them, they certainly are entitled to more or less weight, as applied to transactions of so remote a period ; but the acts of government have frequently an effect ascribed to them, which cannot on any correct principle, influence our opinion, as a court.

Whenever the crown, by its agents, the executive of this colony, divided a district of country among a number of grantees, assigning to each a portion, but retaining no part to itself, it could have neither right nor pretension to interfere in the construction of their respective grants. With its power of disposition, it lost the power of arranging and assigning to each a determinate share ; this could only be settled, if controverted, by judicial interference ; but when part of the district was retained by the crown, as in the case of the land adjoining the *Catskill* patent, when the lands in all directions, except on the east side, were ungranted, the acts of the government may have a controlling effect, as to its own rights, especially after a long lapse of time ; and if a location

*IN ERROR.*
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

was questionable before, I have not the least doubt but that the crown might, by its legal organs, employed to manage and dispose of its interests, as effectually bind itself by a fair, deliberate act, as an individual might, in similar circumstances, settle a controverted limit.

The survey of *Beaty*, the deputy surveyor-general, was of a mixed nature ; the claimants under the *Catskill* patent and confirmation were the applicants ; and the interference of government, was more deliberate and formal than, perhaps, comported with the mode of conducting business of that nature at the time. The deputy surveyor-general, gave a location to the patent, in pursuance of a warrant from the executive, and formally returned it to be deposited, as it was alleged, among the archives of the colony ; of its actual return into any of the public offices, there is, however, no evidence ; the paper produced as an original, being a copy recently made and not certified.

These circumstances might have weight in the construction of the confirmation, where its bounds did not come in contact with other private rights ; but can have none here ; and it is not necessary to give, nor do I mean to give, an opinion on the subject of the location of the confirmation generally. If this could have been fairly presented as an object of consideration in this case, several circumstances arising from the nature and extent of the controversy, I think, ought rather to have induced this court to determine on that ground than to shun it.

This view, and this train of reasoning, has satisfied my mind, better than I could, in the first instance, have possibly hoped, as to the true construction of the confirmation, as far as respects the premises in question, and that the first exception cannot be sustained.

The second exception is to the charge of the judge who presided at the trial ; the third and fourth relate to matters not appearing in the bill of exceptions.

The exception, as appearing from the bill of exceptions, is in the following words : " And thereupon the said counsel, for the said defendant, further desired the said justice, before whom the trial of the said issue was had as aforesaid, to inform the jurors aforesaid, and to declare to them the law of and upon the premises to be, that if the said premises in question, in this cause, be not comprehended within the premises granted in and by the letters patent, so, as aforesaid, produced and given in evidence on the part of the defendant, yet that the evidence of possession of the said premises in question in this cause, adverse to the title under which the plaintiff claimed the same, was sufficient to bar the plaintiff's right to recover the said premises in question, in this action, and required the said justice, so to charge the said jury ; but the said counsel for the said plaintiff objected thereto, and the said justice did refuse so to do, and thereupon did further inform the said jury, and give them in charge, *that the evidence of possession, in order to defeat the plaintiff's title, must establish a peaceable and unequivocal adverse possession, for twenty years antecedent to the commencement of the suit,* and he submitted that point to the jury, with an intimation of his own opinion, that the evidence did not make out such adverse possession, against which opinion, and charge of the said justice, the said defendant by his said counsel, then and there also excepted."

A bill of exceptions was given by statute, not to draw the whole matter into examination again, but only the points to which it is taken ; and the party must lay his finger on those points which must arise, either *in admitting or denying evidence,* or matter of law, arising from *a fact not denied,* in which either party is overruled by the court.*

Whether it will lie to the charge of a judge, for refusing to lay down the law to the jury, has been made a question.

*IN ERROR.*
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

* 2 *Bac. Abr.*
529. tit. *Bill of Exceptions.*

IN ERROR.

ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

* Ld. *Raym.*404.
2 *Jones's Rep.*
146. *Show.* 120.
122.
†2 *Caines's Rep.*
16S.

It is laid down, that if on a trial upon a title to a lease for years, the judges, though insisted upon, will not direct the jury, that the probate of a will is conclusive evidence; but will only tell the jury that it is good evidence, and thereupon the jury find that there is no such will, yet a bill of exceptions will not lie.*

This has been so adjudged in the supreme court, in the case of *Graham* v. *Camman*,† and the law as laid down in *Bacon* was recognised.

The evidence has been detailed in the bill of exceptions, and the effect of admitting an exception to a charge, will be to impose it on this court, to examine the evidence, to review the whole, to determine, not whether it is good evidence, but whether it is doubtful, strong or conclusive; and after this is ascertained, to test the charge of the judge, by the result produced in their minds on the occasion. This is, in every sense of the word, assuming the province of the jury; and instead of deciding on the law only, the facts given in evidence, and their relative weight, are in the first place to be disposed of.

The jury might have found a verdict contrary to the opinion of the judge; and if the case was such as legally imposed it on them to find conformable to the opinion, or the judge had misdirected them as to the law, the proper mode of obtaining redress would be, by application for a new trial.

Without, therefore, entering into a particular examination of the opinion of the judge, as to this exception, which I am, however, inclined to think correct, I would decide it on the ground that this did not arise on the admission or rejection of evidence, *on a fact not denied*, and so not within the proviso of the statute allowing a bill of exceptions.

This distinction cannot apply to the first exception, for there the fact, *the existence of the Catskill confirmation and its import*, are not denied. The construction of its

3

boundaries as matter of law, has been decided on by the <span style="float:right"></span> judge, and this court are to determine on it, as a matter of law only.

Upon the whole, I am of opinion, that the judgment <span style="float:right"></span> of the supreme court ought to be affirmed.

L'HOMMEDIEU, *Senator.* The plaintiff in error has taken several objections to the judgment of the supreme court below ; I shall, however, consider the only principal one respecting the construction of the *Catskill* patent ; because, from the view I have taken of the subject, it will be unnecessary to notice any other.

The description of the land contained in that patent, comprehends five great plains mentioned therein, together with the wood-land adjoining the said plains, extending four *English* miles round the said plains, that is to say, four *English* miles from the said plains eastward ; four *English* miles northward from the said plains ; four *English* miles westward from the said plains, and four *English* miles southward from the said plains.

The court below have located this patent, *by running lines of four miles in length, due north, south, east and west, from the extreme northern, southern, eastern and western parts of the plains, and closing these lines from the extremities by straight lines.* I must dissent from this location, because to me it appears manifestly inconsistent and irreconcilable to the terms of the grant. To common understandings, these words would appear as giving to the patentees an extent of four miles from every part of the five plains ; and it is a settled rule of construction, that the words of a grant are to be interpreted agreeably to the common understanding of mankind ; but, by the location of the supreme court, an extent of four miles is given at the four cardinal points only ; and in every other part coming within that distance, and, indeed, in many places, within three miles of the plains.

CASES IN THE COURT OF ERRORS

*IN ERROR.*
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

This, therefore, cannot possibly, I think, be the true construction. The one contended for on the part of the plaintiff in error, appears to me more reasonable; it satisfies the terms of the grant, and does no more than satisfy them, giving an extent of four miles in every direction from the plains, which appears to me to be the obvious meaning of the words of the grant. The propriety of that location, is very strongly supported by cotemporaneous acts of the government and of the parties.

The survey of *John Beaty*, the deputy surveyor-general, made in the year 1719, in pursuance of a warrant from the colonial government, adopted the construction contended for by the plaintiff in error; and this act strikes me as entitled to great weight. As an officer of government, we must believe that he would not adopt a location, giving more to the patentees than they were entitled to; and as he acted under the surveyor-general, to whom the warrant was directed, it is a reasonable inference, that he also considered this as the proper principle of location. If this survey is not to be considered as an act binding on government, still it affords proof of the opinion of skilful professional men, respecting the location of *Catskill* patent, which ought to have great weight with the court; it is an opinion respecting the objects of their profession, and they could have no possible inducement to give a construction to this grant, not warranted by its terms.

The commissioners who divided the patent in 1767, adopted the same principles, and it appears to be the general opinion of skilful surveyors of the present day, that that location is the true one. And it may be observed, that there is no more difficulty in running lines round those flats, at four miles distance, than there is in running lines on each side of a winding river of four miles distance, which is frequently done by skilful surveyors; add to this, that almost every part of this pa-

tent, where old grants do not interfere, is, and has been possessed conformably to this location. I am, therefore, of opinion, that the judgment of the court below be reversed.

IN ERROR.
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

GEBHARDT, Senator. This cause was brought here on a writ of error from the supreme court.

At the trial of the cause, at the circuit, the defendant in error located the premises in question, as lying within the patent granted to *John Lindsay*, bearing date the 22d day of *August*, 1738; and deduced a regular title under that patent, and rested his cause.

The plaintiff in error relied, for his defence, on two general points.

1st. That the premises in question were included in an older grant, commonly called the *Catskill* patent, bearing date the 29th day of *April*, 1688, and which ought first to be satisfied.

2d. An adverse possession for more than twenty years.

The only question involved in the first point, is the construction to be given, to the description of boundaries contained in the *Catskill* patent.

By the decision of the supreme court, in the cause of *Jackson, ex dem. Clark*, v. *Reeves*, (3 *Caines' Rep.* 293.) the premises in question are excluded, by their location of that grant; and that decision is to be taken as part of this case.

The description of the lands granted, is in manner following:

" A certain tract of land, with the appurtenances, lying, situated and being at a certain place called *Catskill*, in the county of *Albany*, on the west side of *Hudson's* river, and on the south and north sides of the creek, or kill, consisting of five great plains, the first called the *Wachachkeek*, the second *Wichquanachtekak*,

*IN ERROR.*
......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

the third *Pachquyack*, the fourth *Assiskawackkak*, and the fifth *Potick*, together with the wood-land adjoining to the said plains, extending four *English* miles *round* the said plains, that is to say, four *English* miles from the said plains *eastward*, four *English* miles *northward* from the said plains, four *English* miles *westward* from the said plains, and four *English* miles *southward* from the said plains.

It is established, as a general rule of law, that where the words of a grant are doubtful, and capable of different constructions, to adopt the one most favourable to government. And to apply this rule, the defendant in error has presented a number of expositions of the location, as being equally within its construction; but relies on the more amplified location of the supreme court, in the case before cited.

It is conceded, on all hands, that the five plains are connected together, and form an irregular figure, and that the one, at the junction of the *Catskill* and *Caterskill*, is not included. The first location suggested is a line to be run, four miles in circumference. This would not exclude the plains, and, therefore, could not be *round* and *from* the plains; the plains being larger than that in circumference.

The next presented was a common centre, from which by a radius of four miles, the plains would be included in the circle. To this I answer, no mathematical point, as a common centre, could be calculated, from the irregularity of the figure of the plains. Yet, however, if indispensable to the construction of the grant, a point ought to be assumed; but if assumed, in this case, although the plains would be included, by a radius of four miles, the circumference would not be at the distance of four miles *from* the plains, the base given, at any one point, in any direction; the words of the grant could not, therefore, in that way, be satisfied.

IN ERROR.
........
ALBANY,
Feb. 1809.

VAN GO DEN
v.
JACKSON.

The same would be the objection in running four miles north, south, east and west, from this centre, and closing by straight lines, drawn from their extremities.

The location relied on most by the defendant in error, is that given to the grant by the supreme court, which is the most plausible.

In that location, the court adopted four courses, north, east, west and south, and run four lines, four miles in length each, from the four assumed points, that is to say, from the extreme northern, eastern, western and southern extremities of the plains, and then closing, by four straight lines, drawn from their terminations, making a parallelogram.

In support of this construction, the rule of law, as laid down by the decision of the supreme court, in the construction of the *Kayaderosseras* patent, was cited. In that case, it appears, one of the courses to be run was northwardly from a given point. The court decided, as there was no object, or monument, controlling the course, it should be run due north. This I consider correct in principle.

It can, however, only apply to an individual course, or line, to be run from a given point, or object, or there would be as great uncertainty in the place of beginning, as in the course to be run. Nor can it apply to courses to be run, accompanied by explanations and bearings upon every part of an extended plain. In this case we have an irregular figure established, consisting of plains, which form a *base*, upon which the grant is to be extended, and not a single point given from which any course is to start; by this exposition, too, there are only four points from the plains, at the distance of four miles, and not a single arch or curve, but straight lines, enclosing the plains; when, by the terms of the grant, it is to extend *round* and *from* the plains, four miles. Were the grant silent here, I cannot see how this construction could prevail. But it goes on still

*IN ERROR.*
.......
ALBANY,
Feb. 1809.

VAN GORDEN
v.
JACKSON.

further, and gives the bearings of the surrounding wood-lands, on the plains, by the most appropriate and definite expressions. You are to run *round,* and four miles *from* the said plains, eastward, northward, westward and southward, describing every possible point of compass, from the *base;* thereby evidently intending to spread out the grant, to the given distance *from* every part of the plains, so that the exterior boundaries thereof might correspond with the sinuosities of the plains, as much as practicable.

This is the construction I give the grant; nor can I satisfy the terms thereof in any other way. The boundaries of the patent, in my opinion, should be run in such manner round the plains, as that with a line of four miles long from the plains, you would always be able to touch some part or other of the exterior boundary of the plains, from any point in the out bounds of the patent.

Suppose that these plains were in two distinct tracts, at the distance of two miles apart; what other construction than by spreading out the location from those plains, could satisfy those terms? And what would be the operation of the principle adopted by the court below? Or what would it be, if all the plains were distinct pieces, at that distance from each other? The most manifest confusion, and interference of courses and lines, intersecting each other, would follow.

But it has been objected, that it was not practicable to survey a circle by courses and distances. This I admit. Yet, by the case cited from *Vesey,* a circle of twelve miles round *New-Castle,* was settled by the court, upon the question before them; and, it appears, no obstacle in that respect, was presented.

It was likewise said, in that case, that the court directed that a mathematical point, or centre, should be calculated, from which the circle, or circumference, round

IN ERROR.
......
ALBANY,
Feb. 1809.
VAN GORDEN
v.
JACKSON.

*New-Castle*, should be drawn, by a *radius* of twelve miles.

The terms, in that case, were *round about New-Castle*, with no distance given *from*, or *bearings upon* that town, by any single point of compass ; the rule of construction, therefore, adopted, was just.

The survey of *Beatty*, in 1719, and of the commissioners, in 1764, adopted the location, nearly, as contended for by the plaintiff in error ; and they must have considered it as not impracticable.

By the testimony of two old and experienced surveyors, *Christopher Tappen* and *Leonard Bronk*, it appears, that the location by the commissioners was practicable ; and, in their opinion, was made agreeably to the intention and import of the grant.

But, it is said, surveyors are not generally scientific mathematicians ; and the court are, therefore, the better judges ; yet, in the construction of the *Hosick* patent, the court seem to found their decision on the survey of three eminent surveyors, who all agreed as to the construction, and according to which they located that grant. The sinuosities of the river, on both sides of which, to a certain distance, the patent extended, were regarded in that case.

I ask, then, what difference can there be, in principle, whether the course to be run is on a river, or on plains, or in the bearings of a line to be run upon either ? I can see none.

My opinion, upon the whole, is, that the judgment in the court below ought to be reversed.

The location, as the same ought to be established in my opinion, includes the premises in question, in which the plaintiff in error, and his father, have been in possession for upwards of fifty years. This being in coincidence with the location, will supersede any further inquiry in the cause ; and I, therefore, dismiss the second point of adverse possession.

IN ERROR.
......
ALBANY,
Feb. 1809.

A majority of the court being of the same opinion ; it was, thereupon, ORDERED, ADJUDGED and DECREED, that the judgment below be reversed ; that the record be remitted, and that a *venire facias de novo* be awarded.

Judgment of reversal.